IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AIMEE SHEMANO-KRUPP,

Plaintiff,

v.

MUTUAL OF OMAHA INSURANCE COMPANY, et al.,

Defendants.

No. C 05-04693 JSW

**ORDER DENYING DEFENDANT BENARDS' MOTION FOR SUMMARY JUDGMENT**

Now before the Court is the motion for summary judgment or, in the alternative, for partial summary judgment filed by Defendant Rodger L. Benard ("Benard"). Having carefully reviewed the parties' papers and the relevant legal authority, and having had the benefit of oral argument, the Court hereby denies Benard's motion for summary judgment.[1]

## BACKGROUND

Plaintiff Aimee Shemano-Krupp ("Plaintiff") brought this action against defendants United of Omaha Life Insurance Company ("United") and Mutual of Omaha Insurance Company ("Mutual") to obtain life insurance benefits under an employee benefit plan purportedly covering her father, Richard Shemano ("Mr. Shemano"), a stockbroker for The Shemano Group ("TSG"). Benard was Mr. Shemano's insurance agent and the agent for TSG with respect to obtaining the insurance policy at issue and advised Mr. Shemano with respect to the scope and content of the policy. Plaintiff is bringing claims against Benard for professional negligence, negligent misrepresentation, and breach of fiduciary duty.

---

[1] Benard's request for judicial notice ("RJN") is granted. *See* Fed. R. Evid. 201.

The Plan is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. United issued the subject group Life and Accidental Death and Dismemberment Policy, Policy No. GLUG-32N5, effective May 1, 1998 (the "Policy"). (*See* Declaration of Diane Quinones in Support of United and Mutual's Motion for Summary Judgment ("Quinones Decl."), ¶ 4, Ex. A at 0001-0044.)

Under the Plan, a $200,000 death benefit is payable in the event of death of an eligible employee who under the age of 65. (*Id.* at 0026.) The Plan has specific eligibility provisions and defines an eligible employee as a "regular, full-time employee; ... actively employed; and ... receiv[ing] compensation for [their] work." (*Id.* at 0018). Active employment is further defined as "working 30 hours or more a week at [one's] regular job; and customary place of employment." (*Id.*) The policy further provides that the insurance coverage will end when the employee does not satisfy "the requirements for hours worked; or any other eligibility condition in the policy." (*Id.* at 0020.) The same provision also states that "upon uninterrupted payment of premium to [the Insurer, the Insured] may be eligible to continue coverage in accord with the following continuation provision." (*Id.*) Subject to the uninterrupted payment of premium, the policy provides for a limited continuation of life insurance coverage for eligible employees who are no longer defined as actively employed due to total disability. In that circumstance, the life coverage automatically continues for twelve months starting from the date the insured first became totally disabled. However, the policy continues, the 12-month period is extended thereafter, without premium payments, subject to certain conditions. (*Id.* at 0021.) Those required conditions are that the disability began while the employee was insured under the policy, the disability began before the employee reached the age of 60, and the employee has completed the 12-month disability elimination period. (*Id.*) For disabled employees who became disabled over the age of 60, the policy permits eligible employees the option of converting to an individual life insurance policy within 31 days of the date their eligibility ends (12-months plus 31 days). (*Id.*)

According to the long-term disability claim form submitted on behalf of Mr. Shemano by his employer, TSG, on April 19, 2002, Mr. Shemano ceased to work due to the increasing ill

2

effects of lung cancer and a brain tumor. (*Id.* at 0081.) Mr. Shemano also provided a Physician's Statement with his claim which was signed on July 24, 2002 by his doctor and indicated that Mr. Shemano was likely to be permanently disabled and also indicated at the time of his visit in July 9, 2002, the doctor believed that his patient had not worked since April 2002. (*Id.* at 0087-88.) At the time Mr Shemano ceased working he was 61 years old. By letter dated September 19, 2002, United approved Mr. Shemano's total disability claim and began paying benefits. (*Id.* at 0067.)

Although United assessed Mr. Shemano's condition to be severe and likely terminal and did not require regular confirmation of his disability, on August 27, 2003, Mrs. Shemano on her husband's behalf, submitted a Supplementary Report of Disability in which she indicated that her husband had been totally disabled from April or May of 2002 until the date of her report in August 2003. (*Id.* at 0069.) Mrs. Shemano also indicated that Mr. Shemano had been hospitalized from June 26 until July 27, 2003, he was in hospice care and his daily activities were limited to "total bed rest." (*Id.*) Mr. Shemano's physician submitted a supplemental report on August 29, 2003 in which the doctor indicated that Mr. Shemano had been hospitalized and was thereafter admitted to hospice care. (*Id.* at 0070.) Mr. Shemano remained in home hospice care until the date of his death, on December 8, 2003. (*Id.* at 0459.) He was 62 years old. Mr. Shemano received long-term disability benefits from United from July 21, 2002 until the time of his death.

In addition to receiving disability benefits from United, Mr. Shemano applied for and received disability benefits from the Social Security Administration, as well as the California State Disability program. (*Id.* at 0072-74.)

On December 31, 2003, Plaintiff submitted a Proof of Death claim form and death certificate. (Quinones Decl., Ex. A at 0457-59.) United responded to TSG on January 5, 2004 and requested information regarding the last day of active work for Mr. Shemano. (*Id.* at 0451.) On January 23, 2004, United spoke with the selling agent, Benard, who indicated that he believed Mr. Shemano last worked in June 2003. (*Id.* at 00445.) United also spoke with the Chief Operating Officer of TSG, Mike McDonough, who indicated that Mr. Shemano had last

3

worked in April 2002. (*Id.* at 0444-45.) In a subsequent conversation two days later, Mr. McDonough reversed himself and indicated that Mr. Shemano had indeed returned to work approximately two to four months after April 2002 and had been working just enough to cover the premiums for coverage until June 2003. (*Id.* at 0443.) Mr. McDonough also indicated that TSG did not keep any record of the hours Mr. Shemano worked and did not explain how he could have worked only to cover the cost of the premiums which were paid instead by the employer. (*Id.*, Quinones Decl., ¶ 8.) On January 29, 2004, Mr. McDonough faxed a letter to United which indicated that Mr. Shemano had returned to work in June 2002 and ceased working in June 2003, had periodic absences due to his treatment, and received "no monetary compensation during the period between April 2002 and June 2003 because no commissions were earned." (*Id.* at 0442.) There was no contemporaneous documentation indicating the actual days or hours Mr. Shemano had worked during this period. United's consulting physician examined the medical information in Mr. Shemano's claim file and reported there was no documentation indicating that Mr. Shemano could not work during the time period.

Based on the contemporaneous disability claim file records submitted to United by TSG on Mr. Shemano's behalf, by his wife and his physician, as well as submitted to the Social Security Administration and the State of California, United denied Plaintiff benefits by letter dated February 10, 2004. (*Id.* at 0431-32.) The letter explained the applicable policy provisions and noted that the records indicated that Mr. Shemano had last worked in April 2002 and had remained off work due to total disability until his death. It noted that although the employer had advised that Mr. Shemano returned to the office, he did not receive compensation and did not qualify as actively employed during the relevant time period. The letter explained, without reference to specific policy provisions by number, that without remaining actively employed, Mr. Shemano's coverage only continued for a period of 12 months and did not automatically continue as he was over the age of 60 at the time of onset of total disability. The letter further explained that Plaintiff could appeal the decision. (*Id.*)

On February 27, 2004, Mr. McDonough of TSG appealed the decision by United to deny payment of benefits. (*Id.* at 0419.) The letter indicated that Mr. Shemano had returned to

4

work in June 2002 and had worked until December 2003, the month of his death. (*Id.*) The letter stated that he did not receive payment during this period because, as a commissioned sales person, Mr. Shemano only earned enough to cover his employee-paid benefits which were paid on his behalf in lieu of a paycheck. United evaluated the new material and, by internal memorandum, assessed that the new work dates contradicted the information contained in the long-term disability claim records to United as well as the Social Security Administration and the State of California. (*Id.* at 0418.)

On March 26, 2004, United wrote a letter to Plaintiff affirming its decision to deny benefits. (*Id.* at 0413-15.) The denial explained the same reasoning for United's decision, cited a supplemental report from another treating physician and noted the absence of any records from TSG which would document the company's position that Mr. Shemano returned to active employment during the period June 2002 through June 2003. (*Id.*) United also advised Plaintiff that the company would consider any additional information it received within 90 days. (*Id.* at 415.)

On May 17, 2004, United received a call from Mr. Benard in which he stated his belief that Mr. Shemano continued to work through June 2003. (*Id.* at 0393-94.) United continued to maintain the position that it would review the claim if TSG produced contemporaneous documents indicating Mr. Shemano had returned to active employment, such as time cards, records of trade transactions, commission statement, W-2 forms, or the like. (*Id.*) Approximately three months later, United received a letter from Plaintiff's attorney with four letters signed by TSG employees who stated that they had observed Mr. Shemano return to service clients during the disputed time period. (*Id.* at 0384-391.) By letter dated August 26, 2004, United responded to Plaintiff's attorney and advised him that the information received was inadequate to alter the denial decision because United deemed them not credible considering the lack of objective documentation to support the contention of continued employment and compensation. (*Id.* at 0379-381.) The letter further indicated that there was no evidence to explain the contradiction between the recently-submitted letters and the contemporaneous assertions made by Mr. Shemano, his employer and his wife to the insurance

5

company, the State of California and the Social Security Administration as well as his treating physicians that he was not able to work and was therefore qualified to receive disability payments from each of those sources. (*Id.* at 0379.) Again, the letter indicated the decision was a final determination of the appeal, but that United would consider any new information within 30 days. (*Id.* at 0380.)

The Court granted United and Mutual's motion for summary judgment, finding: (1) the insurance policy at issue is subject to and governed by ERISA; (2) Plaintiff's state-law claims against United and Mutual are fully preempted; and (3) pursuant to an abuse of discretion standard, there was substantial evidence to sustain United's denial of coverage. Benard now moves for summary judgment on Plaintiff's claims against him, arguing that Plaintiff's state-law claims are preempted by ERISA and that, even if they are not preempted, they fail as a matter of law.

**ANALYSIS**

**A.      Summary Judgment Standard.**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if the fact may affect the outcome of the case. *Id*. at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Where the moving party will have the burden of proof on an issue at

trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* Once the moving party meets this initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)) (stating that it is not a district court's task to "scour the record in search of a genuine issue of triable fact"). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

**B.    ERISA Preemption.**

Plaintiff asserts state-law causes of action against Benard for professional negligence, negligent misrepresentation, and breach of fiduciary duty. Whether ERISA acts to preempt a state or local law is a question of law. *Farr v. U.S. West Communications, Inc.*, 151 F.3d 908, 913 (9th Cir. 1998). Section 514(a) provides that ERISA "supercede[s] any and all State laws insofar as they now or hereafter relate to any employee benefits plan." 29 U.S.C. § 1144(a). State laws are preempted by ERISA "insofar as they may now or hereafter relate to any employee benefit plan" regulated by ERISA. 29 U.S.C. § 1144(a).

The language of ERISA's preemption provision – covering all laws that relate to an ERISA plan – is clearly expansive. *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). A state law relates to an ERISA employee benefit plan "if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983). "The ERISA preemptive provision is to be broadly construed and extends to common law tort and contract actions." *Gibson v. Prudential Ins. Co. of America*, 915 F.2d 414, 416 (9th Cir. 1990).

Although the text of the ERISA preemption provision is clearly expansive, courts have recognized that the term "relate to" cannot be "taken to extend to the furthest stretch of its indeterminancy," or else "for all practical purposes preemption would never run its course." *Travelers*, 514 U.S. at 655. Indeed, "applying the 'relate to' provision according to its terms

7

was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." *California Division of Labor Standards Enforcement v. Dillingham Construction*, 519 U.S. 316, 335 (1997). "Some state actions may affect employee benefit plans in too tenuous, remote or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw*, 463 U.S. at 100 n.21; *Aloha Airlines*, 12 F.3d at 1504. Accordingly, the Court cannot rely on "uncritical literalism" but must rather attempt to ascertain whether Congress would have expected the particular statute at issue to be preempted. *Travelers*, 514 U.S. at 656.

However, "before a court wades into this provision's 'veritable Sargasso Sea of obfuscation,' it must first resolve the simpler question of whether a party may assert a claim under ERISA." *Miller v. Rite Aid Corp.*, 504 F.3d 1102, 1105 (9th Cir. 2007) (citing *Toumajian v. Frailey,* 135 F.3d 648, 653 n.3 (9th Cir.1998) (citation and internal quotation marks omitted)). "ERISA does not preempt the claims of parties who do not have the right to sue under ERISA because they are neither participants in nor beneficiaries of an ERISA plan." *Miller*, 504 F.3d at 1106. Plaintiff may sue under ERISA only if Mr. Shemano was a "participant" in an ERISA plan "at the relevant time," or if he may have become eligible for benefits from an ERISA plan "at such time." *Id*. In order to establish that Mr. Shemano "may have become eligible," Plaintiff "must have a colorable claim that (1) [she] will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." *Id*. (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117 (1989)).

The Ninth Circuit held in *Miller* that the applicable time for evaluating the claims of a decedent's estate and beneficiaries is the time of death. *Id*. at 1107. Benard argues that the holding of *Miller* is not so narrow and that the "relevant time" here is when the alleged misconduct occurred. Another court has already considered and rejected this argument. *See Widdows v. Fred Meyer, Inc.*, 2008 WL 3992149, * 9-10 (D.Or. Aug. 22, 2008) (finding that under *Miller*, the "relevant time" was time of death, not the time of the alleged misconduct). The Court finds the reasoning of *Widdows* persuasive and agrees that the holding of *Miller* is that the "relevant time" for evaluating Plaintiff's claims is the time of Mr. Shemano's death.

The parties do not dispute that at the time of Mr. Shemano's death, he was not a participant in an ERISA plan. In his reply brief, Benard argues that Plaintiff has a colorable claim for benefits because Plaintiff has maintained in this lawsuit that she has a colorable claim for death benefits because Mr. Shemano continued to work at least thirty hours a week until June of 2003. (Reply at 4-5.) As the Court previously found:

> Because Mr. Shemano was over 60 years of age at the time of the onset of his disability, he was, subject to the unambiguous terms of the policy, entitled to 12 months of continued coverage, at which point the policy was terminated unless he converted to an individual policy. The exception, clearly set out in the policy language, provided that should the insured return to work as an active full-time employee receiving compensation, the period of disability would start over again.

(Docket No. 73 at 15-16.)

The Court has already reviewed the evidence presented by the parties on this issue and determined that "[a]lthough there is some non-contemporaneous evidence that Mr. Shemano may have come into the office at various times to talk with his clients on the telephone, there is no evidence that he was working full-time at his regular job and receiving compensation." (Docket No. 73 at 16.) Accordingly, the Court finds that Plaintiff does not have a colorable claim for benefits under ERISA. Because Plaintiff does not have standing under ERISA to bring a claim, ERISA does not preempt her state-law claims. *Miller*, 504 F.3d at 1106.

**C.   Plaintiff's State-Law Claims.**

**1.   Professional Negligence.**

Benard moves for summary judgment on Plaintiff's claim for professional negligence on the grounds that Benard did not owe any duty to Mr. Shemano to advise him regarding the life insurance policy provisions and that Benard did not breach any duty to the extent any existed. As with any negligence claim, Plaintiff "must show that the defendant had a duty to use due care, that he breached that duty, and that the breach was a proximate or legal cause of the resulting injury." *Rice v. CenterPoint, Inc*., 154 Cal. App. 4th 949, 955 (2007) (citation omitted). The existence of a duty is a question of law to be decided by the court. *Hansara v. Superior Court*, 7 Cal. App. 4th 630, 639 (1992).

"Ordinarily, an insurance agent assumes only those duties normally found in any agency relationship. This includes the obligation to use reasonable care, diligence, and judgment in procuring the insurance requested by an insured." *Jones v. Grewe*, 189 Cal. App. 3d 950, 954 (1987). In *Jones*, the court reiterated the standard set forth in an earlier case that an agent owes a duty to explain the provisions of an insurance policy in response to inquiries regarding coverage. *Id*. at 955 (citing *Westrick v. State Farm Ins.*, 137 Cal. App. 3d 685, 692 (1982)). Contrary the Benard's broad assertions, the court in *Jones* merely held that "[t]he general duty of reasonable care which an insurance agent owes his client does not include the obligation to procure a policy affording the client complete liability protection ... ." *Id* at 956.

*Malcom v. Farmers New World Life Ins. Co.*, 4 Cal. App. 4th 296 (1992) does not assist Benard either. In *Malcom*, the court held that an applicant's question about what effect his treatment for depression might have on his application did not impose an affirmative duty on the insurance agent to advise him regarding the suicide provision and its effect on coverage. *Id*. at 304. The court found that there was no evidence which suggested that the agent knew the applicant procured the insurance policy under the mistaken belief that the policy would cover all suicide-related death. *Id*.

Here, there is evidence in the record sufficient to create a question of fact regarding whether Mr. Shemano asked Benard, in the context of his being diagnosed with brain and lung cancer and having had recent brain surgery, about how to maintain his life insurance coverage. (Declaration of Terrance J. Coleman ("Coleman Decl."), Ex. A at 78:12-22, 83:23-85:25.) Benard responded by telling Mr. Shemano that he only had to worry about converting his life insurance from a group to an individual policy if he left his employer. (*Id*.) However, the insurance policy only provides the $200,000 death benefit for active full-time employees receiving regular compensation. (Quinones Decl., Ex. A.) In light of the record before it, the Court cannot conclude as a matter of law that Benard did not have a duty to advise Mr. Shemano regarding maintaining his life insurance coverage and that Benard did not breach such duty. Accordingly, the Court denies Benard's motion for summary judgment on Plaintiff's claim for professional negligence.

10

### 2. Negligent Misrepresentation.

To establish her claim for negligent misrepresentation, Plaintiff must demonstrate: "(1) a misrepresentation of a past or existing material fact, (2) without reasonable grounds for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) ignorance of the truth and justifiable reliance thereon by the party to whom the misrepresentation was directed, and (5) damages." *Fox v. Pollack*, 181 Cal. App. 3d 954, 962 (1986). Benard argues that he did not make any misrepresentations because he did not discuss life insurance coverage under the insurance plan with Mr. Shemano after he was diagnosed with brain and lung cancer. As discussed above, the Court finds that there is a question of fact which precludes summary judgment on this ground. Next, Benard argues that he reasonably believed Mr. Shemano was covered under the insurance policy, which required that Mr. Shemano was an active full-time employee receiving regular compensation, until June of 2003. Again, the Court finds that there are questions of fact which preclude summary judgment. Therefore, the Court denies Benard's motion for summary judgment on Plaintiff's claim for negligent misrepresentation.

### 3. Fiduciary Duty.

Benard argues that as a matter of law, an insurance broker cannot be held liable for breach of fiduciary duty. However, the authority upon which Benard relies does not stand for this proposition. In *Hydro-Mill Co. v. Hayward, Tilton, and Rolapp Ins. Associates Inc.*, 115 Cal. App. 4th 1145, 1156 (2004), the court held that because a complaint against an insurance broker demonstrated that allegations of professional negligence subsumed all of the allegations for breach of fiduciary duty, the complaint was barred by a two-year statute of limitations. In reaching its conclusion, however, the court noted that "it is unclear whether a fiduciary relationship exists between an insurance broker and an insured." *Id.* Similarly, the court in *Jones v. Grewe*, 189 Cal. App. 3d 950 (1987) did not hold as a matter of law that insurance brokers never owe a fiduciary duty to their clients. The Court notes that in *Steadman v. McConnell*, 149 Cal. App. 2d 334, 338 (1957), the court held that where an insurance agent was an expert in the field and the insured was a layman, there was a fiduciary relationship between

the insurance agent and the insured. Therefore, the Court cannot find that as a matter of law, Bernard did not owe a fiduciary duty to Mr. Shemano, and thus, denies Benard's motion for summary judgment on Plaintiff's claim for breach of fiduciary duty.

## CONCLUSION

For the foregoing reasons, the Court DENIES Benard's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: September 15, 2008

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE